UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                    :

CAI RAIL, INC.,                       :

                           :

             Plaintiff,        :

                           :             20 Civ. 4644 (JPC)

        -v-                 :

                           :          <u>OPINION AND ORDER</u>

BADGER MINING CORPORATION,   :

                           :

            Defendant.     :

                           :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff CAI Rail, Inc. ("CAI Rail") has brought this action in connection with the alleged

default of Defendant Badger Mining Corporation ("Badger") on payments pursuant to an

agreement to lease rail cars.  Dkt. 1 ("Complaint").[1]  Now before the Court are CAI Rail's two

motions for partial summary judgment.  Dkts. 23, 23-1 ("First Motion" or "First Motion for Partial

Summary Judgment"), 40, 41 ("Second Motion" or "Second Motion for Partial Summary

Judgment").  For the reasons stated below, CAI Rail's First Motion for Partial Summary Judgment

is granted as to its breach of contract claim and its Second Motion for Partial Summary Judgment

is denied as to the remaining claims.  CAI Rail further is ordered to show cause by March 3, 2021

why those remaining claims should not be dismissed for reasons discussed herein.

---

[1] On February 1, 2021, after both of CAI Rail's summary judgment motions were fully
briefed, the Court granted CAI Rail's unopposed motion to substitute Infinity Transportation
2020-1, LLC as Plaintiff in this action pursuant to Federal Rule of Civil Procedure 25(c).  Dkt. 48.
CAI Rail reported that, on December 31, 2020, Infinity Transportation 2020-1, LLC "purchased
from CAI Rail all of the right, title and interest in the rail cars, lease, and causes of action brought
and pursued by CAI Rail in this action."  Dkt. 46.  For the sake of clarity given that Plaintiff existed
as CAI Rail at all times relevant to the Court's disposition of its motions, the Court continues to
refer to Plaintiff as "CAI Rail" throughout this Opinion.

## I.  Background

### A.  Facts

In October 2014, CAI Rail and Badger entered into a lease, Dkt. 23-3 (the "Master Lease"), and rail car schedule, Dkt. 23-4 (the "Schedule," collectively with the Master Lease, the "Lease Documents"), pursuant to which CAI Rail leased to Badger one hundred 3,280 cubic feet capacity covered hopper rail cars (the "Cars").  Dkt. 23-9 ("CAI Rail First 56.1 Statement") ¶ 1; Dkt. 30 ("Badger First Counter-56.1 Statement") ¶ 1; Schedule at 1.  Badger, a mining corporation, leased the Cars to transport sand used for hydraulic fracking.   First Motion at 8; Dkt. 29 ("First Opposition") at 1.

On May 18, 2020, James Magee, CAI Rail's President, sent a letter via email to Angelo LaMantia, Badger's Executive Vice President for Supply Chain, which advised that Badger was in default because it had failed to make certain monthly payments due under the Lease Documents. CAI Rail First 56.1 Statement ¶ 2; Badger First Counter-56.1 Statement ¶ 2; Dkt 23-5 ("Termination Letter").  In that letter, CAI Rail stated that it:

> hereby terminates the Schedule and demands immediate payment of (a) the Past Due Amount, and (b) the net present value of all additional amounts that would become due during the full Term of the Schedule (calculated with the identified discount rate applicable as of the date of this letter). In addition, [CAI Rail] demands payment of all other costs, fees, charges and liabilities arising as result of [Badger]'s default, including, without limitation, all amounts related to transportation, repair and storage of the Cars pursuant to Section 13(c) of the Master Lease. All amounts owed are to be paid into [CAI Rail]'s account previously identified for receipt of rental payments during the Term, within 6 business days of this letter.

Termination Letter at 1-2.  It further stated that, "[i]n an effort to reduce costs, [CAI Rail] will seek [Badger]'s cooperation to achieve a smooth and orderly redelivery of all Cars to one or more identified redelivery locations," and "[o]nce such location(s) is/are determined, the Cars should be

redelivered in the condition required by, and otherwise in accordance with, the applicable terms of the Lease Documents." *Id.* at 2.

On June 13, 2020, LaMantia emailed Magee to notify CAI Rail that Badger was facing financial difficulty, and sought CAI Rail's "help by providing financial relief." Dkt. 32-2 at 2. LaMantia attached a proposal to restructure the Lease Documents, *id.* at 4, and offered a "limited amount of rail storage capacity" in return, *id.* at 2. In addition, LaMantia attached a letter, dated June 10, 2020, from Wadsworth Whitestar Consultants, a firm that Badger had engaged to "perform[] an assessment of the business, financial condition and prospects of Badger," which opined that Badger was a "viable business" but needed to "eliminat[e] . . . the expense associated with [Badger]'s excess rail cars." *Id.* at 5-6. That letter attributed Badger's financial troubles to "significant changes in the market for proppant over the last few years," including "[f]alling oil prices," which have been "exacerbated by the economic impact of the COVID-19 pandemic." *Id.* at 5.

CAI Rail filed suit on June 17, 2020. *See* Complaint. On June 23, 2020, Magee emailed LaMantia stating that "CAI Rail wishe[d] to move forward" with the restructuring proposal, subject to a number of listed "caveats," including that Badger would pay all invoices "currently in arrears," which amounted to approximately $205,000; that Badger would pay CAI Rail an additional $848,094; and that the settlement would close by June 30, 2020. Dkt. 32-3 at 2. Magee stated that CAI Rail was drafting a settlement agreement and would send the draft to Badger. *Id.* Magee expressed that CAI Rail "would like" Badger to store the Cars for up to five years "free of storage charge as offered," but "would prefer none of [the] cars . . . be used in service at this moment in time." *Id.* Magee nonetheless stated that "as market demand may change," CAI Rail was amenable to discussing "terms, conditions and rental rate" for Badger's use of the Cars as

additional "opportunities" arise.  *Id.*  He further represented that "the Law suit in New York will remain in place," but that CAI Rail would "withdraw the suit immediately upon closing of this transaction and the receipt of the committed funds by Badger."  *Id.*

On July 3, 2020, Badger paid CAI Rail $68,310, a small fraction of the amount set forth in Magee's email as a condition for CAI Rail's agreement to restructuring.  *See* CAI Rail First 56.1 Statement ¶ 3; Badger First Counter-56.1 Statement ¶ 3.  While CAI Rail continues to invoice Badger under the Lease Documents, Badger has made no other payments since that date and has not returned the Cars.  CAI Rail First 56.1 Statement ¶¶ 3, 4; Badger First Counter-56.1 Statement ¶¶ 3, 4; Dkt. 42 ("CAI Rail Second 56.1 Statement") ¶ 9; Dkt. 45 ("Badger Second Counter-56.1 Statement") ¶ 9.

### B.  Procedural History

In its Complaint, CAI Rail brings four claims: breach of contract (Count I), trespass and failure to return the equipment (Count II), specific performance (Count III), and conversion (Count IV).  Complaint ¶¶ 5-16.  For Count I, CAI Rail claims that it is owed at least $136,620 under the Master Lease due as of April 30, 2020, plus at least $6,900 daily to the date of judgment, as well as any costs necessary to recover the Cars.  *Id.* ¶¶ A-B.  For Count II, CAI Rail seeks trespass damages of at least $6,900 daily from the May 18, 2020 Termination Letter until the date of the Court's judgment, as well as any interest, costs, and attorneys' fees.  *Id.* ¶ C.  For Count III, CAI Rail seeks the immediate return of the Cars.  *Id.* ¶ D.  Finally, for Count IV, as well as in the alternative to Counts II and III, CAI Rail requests that the Court enter judgment against Badger "for the intentional tort of conversion of the [Cars], with damages of the value of the equipment, plus attorneys' fees, interest and costs of at least $2,500,000, with such amount to be finally determined on motion or after trial."  *Id.* ¶ E.

This case was originally assigned to the Honorable Lorna G. Schofield, who held an Initial Pretrial Conference ("IPTC") on August 27, 2020.  During the IPTC, the parties discussed CAI Rail's intent to file a motion for summary judgment on the question of liability prior to conducting any discovery, as well as Badger's intended affirmative defenses of waiver, impossibility, and frustration of purpose.  Dkt. 24 ("Tr.") at 2-3, 13-14; *see also* Dkt. 10 at 3-4.[2]  The Court granted CAI Rail leave to file a motion for summary judgment, but emphasized that it would not accept multiple motions on the issue of liability.  Tr. at 13.  During the IPTC, Badger's counsel also represented that CAI Rail had not provided a return location for the cars, but if CAI Rail were to, counsel believed that Badger would be amenable to returning the cars.  *Id.* at 5-6.

Following the IPTC, Judge Schofield issued an Order requiring CAI Rail to submit a letter (1) stating the scope of its intended motion, (2) confirming its "understanding that multiple summary judgment motions on the same subject matter (*e.g.*, liability) will not be accepted," and (3) proposing a briefing schedule agreed upon by the parties.  Dkt. 20.  In compliance with that Order, CAI Rail submitted a letter confirming its understanding that only a single motion on liability would be accepted, Dkt. 21 at 2, and that the motion would "be to confirm Badger's liability for default on the lease," *id.* at 1.  That letter further provided a location for the return of the Cars, *id.* at 2, which was the first of two different return locations that CAI Rail has now provided Badger, *see* Dkt. 36 at 4; CAI Rail Second 56.1 Statement ¶ 17; Badger Second Counter-56.1 Statement ¶ 17.  On September 4, 2020, CAI Rail filed its First Motion for Partial Summary

---

[2] Although Badger raised several affirmative defenses in its Answer, Dkt. 10 at 3-4, it narrowed those defenses to waiver, impossibility, and frustration of purpose during the August 27, 2020 IPTC, Tr. at 2-3, 4-5, and does not argue any additional affirmative defenses in opposing CAI Rail's summary judgment motions.

Judgment.  Dkts. 23, 23-1.  On September 25, 2020, Badger filed its First Opposition.  Dkt. 29.

On October 2, 2020, CAI Rail filed a reply brief in further support of its First Motion.  Dkt. 34.

On September 24, 2020, while briefing on the First Motion for Partial Summary Judgment was ongoing, CAI Rail requested leave to file another motion for partial summary judgment on Counts II, III, and IV.  Dkt. 26.  CAI Rail contended that it had elected not to move with respect to these counts previously because Badger had represented that the Cars would be returned, but that had not yet happened.  *Id.*  On September 30, 2020, Badger submitted a letter opposing this request.  Dkt. 33.  The case was then reassigned to the undersigned.  On October 28, 2020, in light of the purported change in circumstances regarding the return of the Cars, the Court granted CAI Rail leave to file a second motion as to Counts II, III, and IV.  Dkt. 37.  CAI Rail filed its Second Motion for Partial Summary Judgment on November 10, 2020.  Badger filed an opposition brief on November 24, 2020.  Dkt. 44 ("Second Opposition").  CAI Rail filed its reply brief on December 4, 2020.  Dkt. 46 ("Second Reply").[3]

## II. Legal Standard

Summary judgment should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine dispute of material fact exists, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).

---

[3] On November 3, 2020, CAI Rail requested leave to file a third motion for partial summary judgment.  Dkt. 38.  The Court held a conference on November 17, 2020 to discuss the request, and denied leave to file that motion in light of Judge Schofield's explicit direction that only one motion for partial summary judgment would be permitted and the Court's decision to allow a second such motion only in light of the purported changed circumstances cited by CAI Rail.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact on each material element of the claims asserted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *accord Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013). "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'" *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (alteration in original) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30, 32 (2d Cir. 1993)). "While whatever evidence *there is* to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 323). "After all, in cases where there is an absence of evidence to support an essential element of a defense, with respect to that defense 'there can be "no genuine issue as to any material fact" since a complete failure of proof concerning an essential element of the [defendant's affirmative defense] necessarily renders all other facts immaterial.'" *Id.* at 54-55 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 323). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (internal quotation marks and citation omitted).

### III. Discussion

The Court begins with CAI Rail's breach of contract claim discussed in its First Motion for Partial Summary Judgment, before turning to the trespass, specific performance, and conversion claims discussed in CAI Rail's Second Motion for Partial Summary Judgment.[4]

### A.  Count I:  Breach of Contract

In its First Motion, CAI Rail argues that the Court should grant partial summary judgment with respect to Badger's liability for breach of contract based on its failure to pay rent due under the Lease Documents, maintaining that Badger has no viable legal defenses to excuse its breach. *See* Dkt. 23; First Motion at 2-3, 12.  The Court thus considers both CAI Rail's substantive claim for breach of contract and its interrelated contention that Badger has no support for its affirmative defenses.

The parties agree that New York law governs this dispute, as provided for in the Master Lease.  *See* First Motion at 2; First Opposition at 5; Master Lease ¶ 18.  To establish a breach of contract under New York law, the plaintiff must prove "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).  Several of these elements are not in dispute.  It is undisputed that the parties entered into a valid, written agreement.  CAI Rail First 56.1 Statement ¶ 1; Badger First Counter-56.1 Statement ¶ 1.  The parties also largely do not dispute that CAI Rail adequately performed under the contract, aside from Badger's contention

---

[4] CAI Rail spends a significant portion of its Second Motion for Partial Summary Judgment on its breach of contract claim.  CAI Rail elected to file its First Motion prior to conducting any discovery with full knowledge that it would not be permitted a second bite at the apple.  *See* Dkts. 20, 21.  Because CAI Rail's Second Motion far exceeds its permissive scope, *see* Dkt. 37, the Court does not consider CAI Rail's breach of contract arguments raised in that motion.

that CAI Rail failed to properly notify Badger of the breach.  Finally, the parties do not dispute that Badger has failed to make several monthly payments, as required by the Master Lease.  Badger nonetheless argues that it has several affirmative defenses to its breach—waiver, frustration of purpose, and impossibility—which can withstand summary judgment.  The Court addresses each contention in turn.

### 1.   CAI Rail Adequately Terminated the Lease

First, the parties dispute whether CAI Rail notified Badger of the default in a manner consistent with the Lease Documents.  CAI Rail contends that the May 18, 2020 email from McGee to LaMantia, attaching the Termination Letter, constituted "written notice to Badger of Badger's default under the Lease Documents . . . , demanding certain payments and return of the Cars." First Motion at 3; *see* Termination Letter at 1.  Badger responds that CAI Rail's transmission via email of the Termination Letter was insufficient to terminate their contract because the Master Lease specified that "[a]ll notices given under this Master Lease shall be in writing and shall be deemed to have been duly given if delivered or mailed by certified mail, return receipt requested, postage prepaid to the other party, or sent by facsimile (confirmed promptly in writing), at its address or facsimile number."  Master Lease ¶ 17; *see* First Opposition at 7.

As an initial matter, the Master Lease did not require any notice following breach in order to bring this suit.  The Master Lease provided that:

> If [Badger] fails to pay any Rent . . . required to be paid under any Schedule, . . . [Badger] shall, *without further notice*, be in default, and the [CAI Rail] may exercise any one or more of the following remedies: (i) sue for and recover (A) all Rent, Additional Rent and other amounts due, and (at [CAI Rail]'s election) either (B) all subsequently accruing Rent, Additional Rent and other amounts as they become due or (C) the net present value of all amounts as may thereafter accrue for the balance of the Term . . . ; (ii) demand that [Badger] promptly return of any or all of the Cars; (iii) take possession of any or all of the Cars without demand or notice, without court order or other process of law and without liability for any damages occasioned by the taking of possession; (iv) terminate such Schedule and

> any or all of the other Schedules hereto as to any or all of the Cars; or (v) pursue
> any other remedy available to [CAI Rail] at law or in equity.

Master Lease ¶ 13(a) (emphasis added).  Thus, while the Master Lease required that notice be given by mail or facsimile in certain circumstances, including to demand redelivery of the Cars, *see* Master Lease ¶ 13(b), notice was not required to pursue other remedies in the event of Badger's failure to pay.  *See Bank of Am., Nat. Ass'n v. Commack Properties, LLC*, No. 09 Civ. 5296, 2010 WL 5139219, at *5 (E.D.N.Y. Dec. 10, 2010) (concluding that notice of default was not required by a mortgage that provided that "Mortgagee may take such action, without notice or demand, as it deems advisable" upon default); *CIT Grp./Equip. Fin., Inc. v. Shapiro*, No. 09 Civ. 409 (JPO), 2013 WL 1285269, at *2 (S.D.N.Y. Mar. 29, 2013) ("The plain language of the contract cuts squarely against this hypothesized notice requirement.  It provides, in pertinent part, that upon default, Plaintiff was entitled to 'without notice or further action . . . declare immediately due and payable . . . all Rent Payments due under the Lease . . . .'").

Moreover, under New York law, "strict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation."  *Baygold Assocs., Inc. v. Congregation Yetev Lev of Monsey, Inc.*, 916 N.Y.S.2d 639 (App. Div. 2011) (quoting *Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 826 N.Y.S.2d 392 (App. Div. 2006)); *see also Thor 725 8th Ave. LLC v. Goonetilleke*, 138 F. Supp. 3d 497, 509-10 (S.D.N.Y. 2015) (collecting cases), *aff'd*, 675 F. App'x 31 (2d Cir. 2017).  There is no dispute that Badger had actual notice, and Badger does not point to any prejudice from CAI Rail's failure to provide notice by certified mail or facsimile.  The Court therefore rejects Badger's contention that CAI Rail provided inadequate notice of the breach.

### 2.   CAI Rail's Claims Are Not Barred by the Doctrine of Waiver

Badger raises several affirmative defenses.  First, it contends that CAI Rail waived the breach of the lease.  "Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable.  Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage."  *Tom Rice Buick-Pontiac v. Gen. Motors Corp*., 551 F.3d 149, 157 (2d Cir. 2008) (quoting *Gen. Motors Acceptance Corp. v. Clifton–Fine Cent. Sch. Dist*., 85 N.Y.2d 232, 236 (1995)).  "To support a finding of waiver, Defendant[] must show that Plaintiff[] had a clear, unmistakable, and unambiguous intent to relinquish their legal rights."  *Silverman v. Miranda*, 116 F. Supp. 3d 289, 303 (S.D.N.Y. 2015), *aff'd sub nom. Silverman v. Teamster Local 210 Affiliated Health & Ins. Fund*, 725 F. App'x 79 (2d Cir. 2018), *as amended* (June 7, 2018).  "A party's intention to relinquish its known contractual rights must be 'clear, unmistakable, and without ambiguity,' and 'is not to be inferred from a doubtful or equivocal act.'"  *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12 Civ. 2827 (NRB), 2013 WL 1191895, at *6 (S.D.N.Y. Mar. 22, 2013) (quoting *Faiveley Transp. USA, Inc. v. Wabtec Corp*., 758 F. Supp. 2d 211, 217 (S.D.N.Y. 2010) and then *Echostar Satellite L.L.C. v. ESPN, Inc*., 914 N.Y.S.2d 35, 39 (App. Div. 2010)).

Badger contends that its "waiver defense is straightforward":  "After providing ineffective notice in May claiming to terminate the lease and seeking the return of the railcars, CAI reversed course in June.  Verbally and in writing, CAI Rail's President stated that Badger should retain and store the cars after discussions with Badger . . . ."  First Opposition at 1.[5]  In support, Badger cites

---

[5] Although Badger states that these discussions occurred both "[v]erbally and in writing," LaMantia's declaration discusses only a June 23, 2020 email.  *See* Dkt. 32 ¶ 25.  And while that email references a call between Magee and LaMantia the previous day, the email provides no details as to the content of that call beyond that it was "related to the restructuring of [their] current

to the June 23, 2020 email from Magee to LaMantia, in which Magee expressed CAI Rail's desire to proceed with certain restructuring terms offered by Badger subject to numerous caveats, indicated that CAI Rail was drafting settlement paperwork for Badger to review, and relayed CAI Rail's preference that Badger store all of the Cars for up to five years "free of storage charge as offered."  Dkt. 32-3 at 2.[6]

But, even viewing this email in the light most favorable to Badger, it does not support a finding of waiver by CAI Rail.  On its face, the email reflected CAI Rail and Badger's efforts to resolve Badger's liability following Badger's failure to pay under the Master Lease.  As made explicit in the email, any agreement on restructuring was conditioned on certain "caveats," including Badger's payment of all invoices in arears totaling $205,000 and an additional $848,094, as well as the execution of a settlement agreement.  *Id.*  Magee additionally emphasized that CAI Rail's lawsuit would remain in place, and would only be terminated upon execution of that settlement and payment of the agreed-upon amounts.  *Id.*  Neither of these two events ever took place.  Accordingly, rather than exhibiting a "clear" and "unmistakable" relinquishment of rights, *Highland CDO Opportunity Master Fund, L.P.*, 2013 WL 1191895, at *6, Magee's June 23, 2020 email demonstrated CAI Rail's intent to retain its contractual rights.[7]

---

lease," Dkt. 32-3 at 2, and LaMantia makes no representations about the contents of that call in his declaration.

[6] The email appears to have been sent as part of settlement discussions, and accordingly would be inadmissible to "prove or disprove the validity or the amount of a disputed claim" under Rule 408 of the Federal Rules of Evidence.  However, the Court finds it appropriate to consider the email for the limited purpose of assessing whether it reflected a waiver of CAI Rail's rights under the Lease Documents.  *See PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 113 (2d Cir. 2008) (concluding that evidence of settlement discussions was admissible to support plaintiff's judicial estoppel argument).

[7] While the Court could imagine events following the June 23, 2020 email—such as the execution of a settlement agreement and/or payment of the settlement amount—that might complicate CAI Rail's ability to continue to pursue liability for breach of contract, Badger does not argue as much.  Instead, Badger primarily contends that CAI Rail's request in the email that

### 3. CAI Rail's Claims Are Not Barred by the Doctrines of Frustration of Purpose or Impossibility

Second, Badger contends that it should be excused from default based on the frustration of purpose and impossibility doctrines. The frustration of purpose doctrine "offers a defense against enforcement of a contract when the reasons for performing the contract cease to exist due to an unforeseeable event which destroys the reasons for performing the contract." *Structure Tone, Inc. v. Universal Servs. Grp.*, 929 N.Y.S.2d 242, 246 (App. Div. 2011). "In order to be invoked, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, the transaction would have made little sense." *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 839-40 (Bankr. S.D.N.Y. 2020). In other words, "the inducing circumstance which no longer exists must be the foundation of the contract." *Pettinelli Elec. Co. v. Bd. of Ed. of New York (New-PS 43 & IS 44)*, 391 N.Y.S.2d 118, 119 (App. Div. 1977) (internal quotation marks and citation omitted), *aff'd sub nom. Pettinelli Elec. Co. v. Bd. of Educ. of New York*, 43 N.Y.2d 760 (1977). In addition, "[t]he doctrine of frustration of purpose does not apply unless the frustration is substantial," and it is therefore "not enough that the transaction has become less profitable for the affected party or even that [the affected party] will sustain a loss." *Rockland Dev. Assocs. v. Richlou Auto Body, Inc.*, 570 N.Y.S.2d 343, 344 (App. Div. 1991).

Impossibility is a similar but distinct defense under New York law. "Impossibility excuses a party's performance only when" (1) "the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible" and (2) the impossibility was

---

Badger store the Cars should prevent this suit. But at most this request pertained to a certain remedy for the breach and hardly reflected a waiver of CAI Rail's contract rights. *Cf. ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 388-89 (S.D.N.Y. 1999) (explaining the difference between waiver, whereby a party waives its contractual rights, and the election of remedies, whereby a party preserves its contractual rights but elects between inconsistent remedies for a breach and is then bound by that election).

"produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900, 902 (1987). This is grounded, in part, on the "judicial recognition that the purpose of contract law is to allocate risks." *Id.* Thus, while "New York courts excuse a party from performing obligations that are 'impossible' to perform, . . . 'impossibility' does not excuse performance of a contract merely because the performance would be burdensome or unprofitable." *In re Condado Plaza Acquisition LLC*, 620 B.R. at 840-41 (citing *Kel Kim Corp.*, 70 N.Y.2d at 902).[8]

Badger contends that its "affirmative defenses of impossibility and frustration of purpose are . . . straightforward": "The onset of the COVID-19 pandemic and the enaction of stringent regulations of many aspects of daily living in the United States caused more than a third of Badger's business to disappear virtually overnight." First Opposition at 1. Badger further asserts that the "travel restrictions and reduced economic activity related to the mitigation of COVID-19," Dkt. 32 ¶ 12, have caused "oil consumption in the United States [to fall] to the lowest level in 30 years," *id.* ¶ 7, and that "[t]he sudden and dramatic decline in oil production caused by COVID-

---

[8] Badger contends that New York courts "often use 'impossibility' and 'impracticability' interchangeably when analyzing whether a party's performance under a contract is to be excused due to intervening, unforeseeable events." First Opposition at 16-17. The New York Uniform Commercial Code uses an "impracticability" test rather than "impossibility." N.Y.U.C.C. § 2-615(a). While "[i]t is not so clear whether 'commercial impracticability,' as opposed to traditional notions of 'impossibility,' is really a separate contract defense under New York law outside the context of the Uniform Commercial Code," it appears that, at most, New York courts require claims of impracticability to meet the same high standard for impossibility outlined in *Kel Kim Corp.*, 70 N.Y.2d at 902. *In re Condado Plaza Acquisition LLC*, 620 B.R. at 841; *see also Clarex Ltd. v. Natixis Sec. Ams., LLC*, No. 12 Civ. 7908 (GHW), 2014 WL 4276481, at *11 (S.D.N.Y. Aug. 29, 2014) ("New York courts do not appear to recognize commercial impracticability as a separate defense to the doctrine of impossibility; rather, impracticability is treated as a type of impossibility and construed in the same restricted manner."). While "impracticability" could be read to impose a lower burden, the Court, like Badger in its briefs, emphasizes that Badger must demonstrate that performance is "objectively impossible," rather than simply impracticable. First Opposition at 17.

19 and attendant government regulations" have harmed the oil industry, *id.* ¶ 10, and "greatly degraded Badger's financial position," *id.* ¶ 22.

In arguing that the Court should grant summary judgment in its favor on Badger's impossibility and frustration of purpose defenses, CAI Rail points to three facts specific to this case.  First, Badger continues to use the Cars, First Motion at 4-5, 8; Dkt. 23-8, although LaMantia, Badger's Executive Vice President of Supply Chain, contends that Badger's use of the Cars was simply "happenstance because [the Cars] are dispersed through the system," Dkt. 32 ¶ 28.  Second, Wadsworth Whitestar Consultants, the consulting firm engaged by Badger, opined in a June 10, 2020 letter that Bader was a viable business, but explained that Badger was facing economic troubles based on market changes "over the last few years," which required elimination of expenses associated with its excess rail cars to remain viable.  First Motion at 8; Dkt. 23-6; *see* Dkt. 32-2 at 5-6.  Finally, on June 13, 2020, Badger sent CAI Rail a proposal to restructure the Lease Documents, which would have kept the same number of cars but vastly reduced the rent. First Motion at 8; Dkt. 23-7.  Relying on these documents, CAI Rail contends that the only impediment preventing Badger from paying the rent due under the Lease Documents is its "cash flow problems," which do not excuse performance under either doctrine.  First Motion at 9.  CAI Rail further notes that the Lease Documents have no *force majeure* clause and there is no government restriction preventing Badger from selling its sand.  *Id.* at 8-9.[9]

In response, Badger argues that CAI Rail has not met its burden to show that there is no issue of material fact.  Badger contends that the absence of a *force majeure* clause is not relevant

---

[9] The Court agrees with Badger that certain extrinsic sources cited by CAI Rail for its contention that a global pandemic and resulting adverse economic effects were foreseeable— namely, the 2011 motion picture "Contagion" and a 2007 paper from the University of Minnesota Center for Infectious Disease Research and Policy—are improper for the Court to consider.  *See* First Motion at 10.  Accordingly, the Court has not relied on these sources.

to the question of whether it has raised an affirmative defense of frustration or impossibility, and that economic downturns can frustrate the purpose of a contract and, in some instances, make a contract impossible. *See* First Opposition at 12-13 (citing *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 728 (7th Cir. 2009)). Badger maintains that there is an open question of material fact because the parties could not have anticipated a global pandemic or the ensuing government restrictions, which have impacted Badger's business. *See id.* at 15-16.

The unchallenged evidence that CAI Rail has put forward—including Badger's consultant's letter about the prospect of its business and Badger's proposal to restructure the Lease Documents at a lower rent—shows that there is an absence of material fact supporting Badger's affirmative defenses of frustration of purpose and impossibility. As an initial matter, it bears emphasizing that Badger does not point to any specific government regulations that it contends have frustrated the purpose of the contract. Badger, for instance, has not identified any government order that has precluded it from engaging in the business for which it leased the Cars. Indeed, Badger acknowledges that "no government order directly made Bader's performance impossible." First Opposition at 17. Instead, Badger mentions without specificity government orders and regulations that have impacted daily life and Badger's performance, *id.* at 10, 16, and focuses on the general economic consequences from the pandemic, which has harmed Badger's "financial position," Dkt. 32 ¶ 7-22.

But "[i]n New York, a party is not excused from a contract simply because it becomes more economically difficult to perform," *A + E Television Networks, LLC v. Wish Factory Inc.*, No. 15 Civ. 1189 (DAB), 2016 WL 8136110, at *13 (S.D.N.Y. Mar. 11, 2016), and "a change in market conditions or an increase in the cost of performance are insufficient grounds to assert" New York's frustration of purpose defense, *Health-Chem Corp. v. Baker*, 737 F. Supp. 770, 776 (S.D.N.Y.),

16

*aff'd*, 915 F.2d 805 (2d Cir. 1990).  "Quite a bit more is required than demonstrating a desire to avoid the consequences of a deal gone sour."  *Id.*; *see also 407 E. 61st Garage, Inc. v. Savoy Fifth Avenue Corp.*, 23 N.Y.2d 275, 281-82 (1968) ("[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused. . . .  [W]ere the rules otherwise, they would place in jeopardy all commercial contracts.").  Accordingly, even if the Court were to find that certain aspects of the pandemic were unforeseeable, Badger faces an uphill battle in arguing that an economic downturn was so unforeseeable such that it could not have been contracted around.  *See United States v. General Douglas MacArthur Sr. Village*, 508 F.2d 377, 381 (2d Cir. 1974) ("Discharge under this doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.").  Moreover, while Badger attributes its breach to the pandemic, the record reflects that demand for oil was declining before the pandemic even began.  *See, e.g.*, Dkt. 32 ¶ 10; *see also* Dkt. 23-6.

However, the Court need not determine if the events over the last year were foreseeable because it cannot be said that the foundation of the contract—to lease rail cars, even if only for the exclusive purpose of transporting sand—has been "destroy[ed]," *Structure Tone, Inc.*, 929 N.Y.S.2d at 246, or "no longer exists," *Pettinelli Elec. Co.*, 391 N.Y.S.2d at 119.  Although Badger contends that the contract is "worthless" to Badger, Dkt. 32 ¶ 21, there is nothing in the record to support this conclusory statement.  While the oil market may be down "to the lowest level in 30 years," *id.* ¶ 7, Badger has not shown that it has ceased to exist.  Although Badger contends that the industry is at a "standstill," First Opposition at 3, LaMantia's declaration reflects that there continues to be a demand for proppant, Dkt. 32 ¶¶ 10, 11.  Moreover, while the June 10, 2020 letter from Wadsworth Whitestar Consultants—drafted after the pandemic was well underway—

described the "significant changes in the market for proppant over the last few years," which were "exacerbated by the economic impact of the COVID-19 pandemic," it did not state that the industry had ceased, and in fact suggested that Badger could continue to compete in the industry if it made certain business decisions.  Dkt. 32-2 at 5-6.

In addition, Badger continues to use rail cars, Dkt. 23-8, even if it was "happenstance" that the cars it used were CAI Rail's, *see* Dkt. 32 ¶ 28.  While the June 10, 2020 consultant's letter recommended that Badger reduce its fleet of rail cars, it recommended that it reduce it from 4,000 to 1,500—not zero.  Dkt. 32-2 at 6.  That Badger may have entered into too many rail car leases in the aggregate, many of which are now unnecessary in light of changed economic circumstances, does not somehow render the foundation of *this* contract—which was for 100 rail cars— sufficiently frustrated such that Badger's breach should be excused.  At most, Badger has shown that the contract has become unprofitable and "more onerous," which does not excuse performance under New York law.  *See Health-Chem Corp.*, 915 F.2d at 776-77, 810 (concluding that a decline in a company's stock price after the October 1987 market crash that would require one party to pay the other party a $10 million adjustment did not excuse performance).

Nor has Badger pointed to any specific facts showing how the pandemic has rendered the contract *impossible* to perform.  *Hoosier*, 582 F.3d 721, on which Badger relies, is inapposite.  In that case, the Seventh Circuit, applying New York law, considered a contract that required the plaintiff to retain a certain surety which would guarantee payment on a lease, but stated that if that surety's credit rating dipped below a particular number, the plaintiff would have 60 days to find a replacement.  *Id.* at 724.  In 2008, that surety's credit rating dropped below the threshold rating outlined in the contract, and the plaintiff was unable to find a replacement because of the economic downturn.  *See id.*  The plaintiff filed suit and sought a preliminary injunction enjoining the

defendant from asserting that the plaintiff was in default, on the theory that finding a replacement surety was "impossible." *Id.* at 724-25. The court distinguished between two scenarios. First, if the contract were read to provide the plaintiff with the "option" of finding a replacement third-party and it was prohibitively costly to do so, that would not support a finding of impossibility. *Id*. at 729. By contrast, if the contract were interpreted to impose "a *duty* to find a better surety," as the court understood the contract at issue, "[t]hen it might be possible to make out a real impossibility defense, meaning that (a) all parties to the transaction assumed, when they negotiated the terms, that it would be possible to find *some* other intermediary with adequate credit standing, and (b) as a result of a financial crisis, no such intermediary existed in late 2008." *Id.* The court cautioned, however, that even the latter argument would "be a difficult defense to make out under New York law" beyond the preliminary injunction stage, as New York law allows for the defense of impossibility "only if some unexpected event upsets all parties' expectations; it is not enough that the unexpected event puts one side in a bind." *Id.*

Badger, by contrast, does not point to anything in the Lease Documents that became truly impossible to perform. Again, Badger points only to the existence of the pandemic and its economic fallout, which rendered the contract less favorable than Badger had anticipated when the contract was executed. If Badger had pointed to some government regulation that made completion of the transaction impossible, the analysis might be different. But its own documents, as well as its continued use of some of the Cars, demonstrate that the contract has simply become unprofitable for Badger, even if dramatically so.[10] While the Court sympathizes with Badger, this is insufficient to raise a defense of frustration of purpose or impossibility under New York law.

---

[10] Although Badger makes much of the fact that CAI Rail filed its First Motion prior to conducting any discovery, *see* First Opposition at 2, 11, it does not point to any facts that are unavailable to it that would be necessary to justify its opposition, *see* Fed. R. Civ. P. 56(d).

\* \* \*

Accordingly, the Court grants CAI Rail's First Motion for Partial Summary Judgment on Badger's liability for breach of contract. CAI Rail has demonstrated the absence of a genuine dispute of fact regarding the breach of contract—the parties had a valid agreement, CAI Rail adequately performed, and Badger breached—and the absence of evidence supporting any of Badger's affirmative defenses.

### B.  Counts II, III, and IV:  Trespass, Conversion, and Specific Performance

In its Second Motion for Partial Summary Judgment, CAI Rail contends that the Court should grant summary judgment on its claims for trespass, specific performance, and conversion because Badger has not returned the Cars. *See* Second Motion at 11-12.

#### 1.  CAI Rail's Trespass and Conversion Claims Appear to Be Duplicative of Its Breach of Contract Claim

"Under New York law, trespass is the intentional invasion of another's property." *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (citing *Ivancic v. Olmstead*, 66 N.Y.2d 349, 352 (1985), *cert. denied*, 476 U.S. 1117 (1986)). "Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (citing *Bankers Trust Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro*, 590 N.Y.S.2d 201 (App. Div. 1992)). "However, New York law draws a distinction between a conversion claim where a person has wrongfully taken property and one where a person did not take the property but wrongfully retains [it]." *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006). "Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." *Schwartz v. Capital Liquidators, Inc.*,

984 F.2d 53, 54 (2d Cir. 1993) (per curiam) (quoting *Johnson v. Gumer*, 464 N.Y.S.2d 318, 319 (App. Div. 1983)).

Badger contends that CAI Rail cannot maintain its conversion and trespass claims because they are duplicative of its breach of contract claim. "Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). "Such a 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.'" *Id.* (quoting *Clark–Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)). If a tort claim is solely based on a contractual breach, "the claim is precluded as duplicative." *Id.*; *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) ("A conversion claim may only succeed if the party alleges a wrong that is distinct from any contractual obligations.").

The Court agrees with Badger that CAI Rail's tort claims appear to be duplicative of its contract claims. Although CAI Rail has done little to explain its tort claims, those claims seem to be premised only upon Badger's contractual obligation to return the cars. *See Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980) ("If the only interest at stake is holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort."); *Aleem v. Experience Hendrix, L.L.C.*, No. 16 Civ. 9206 (ER), 2017 WL 3105870, at *6 (S.D.N.Y. July 20, 2017) (dismissing a claim for conversion where the "[p]laintiffs base their claims for conversion and replevin on [the defendant's] repudiation of its contractual obligation to return the Guitars upon request"). CAI Rail's tort claims thus appear to concern "the same facts" as its breach of contract claim, and CAI Rail "ha[s] not established any conversion damages distinct from the breach of contract claim," which is a concern because "if Plaintiff[]

were to recover under both claims, [it] would in effect be paid twice." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004), the only case that CAI Rail cites in support of its argument that its conversion claim is not duplicative of its breach of contract claim, *see* Second Reply at 3, is distinguishable.[11]  In *Moses*, the plaintiff, a celebrity wardrobe stylist, contracted with an agency for it to be her manager. *Moses*, 360 F. Supp. 2d at 537.  The plaintiff brought suit against the agency and its principal, alleging that the defendants failed to pay her money she was due on the contract, repeatedly lied to her about the payments that her clients had paid the agency, and over-charged her clients. *Id.*  Unlike the allegations in *Moses*, Badger is "not alleged to have engaged in any wrongful conduct separate and apart from their failure to" abide by the contract. *Solomatina v. Mikelic*, 370 F. Supp. 3d 420, 432 (S.D.N.Y. 2019) (distinguishing *Moses*); *see AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*, No. 04 Civ. 8832 (KMK), 2006 WL 1593884, at *4 (S.D.N.Y. June 7, 2006) (distinguishing *Moses* which involved allegations that the defendant "engaged in a pattern of deceiving Plaintiff," wrongly "demanded payment from Plaintiff for 'advances' which contractually belonged to Plaintiff but which Defendant falsely represented were payments from its own funds," and "over-charged Plaintiff's clients in order to line its own pockets").  Instead, with respect to its conversion claim, CAI Rail alleges only that Badger breached the Master Lease and is in violation of that contract's default provisions by retaining the Cars.  Complaint ¶¶ 14-16; *see AD Rendon Commc'ns, Inc.*, 2006 WL 1593884, at *4  ("Here, Plaintiff simply alleges that Defendant transferred and retained

---

[11] CAI Rail does little in its Second Motion to explain why the Court should grant summary judgment on its trespass claim, and does not defend its trespass claim at all in its Second Reply.

monies that contractually belonged to Plaintiff.").   Such an action appears to be barred as duplicative under New York law.

### 2.  The Court Declines to Grant Specific Performance

CAI Rail does not even provide a cursory argument for why it is entitled to summary judgment on its specific performance "claim."  As an initial matter, it is well-settled that specific performance is not a separate cause of action, but rather "an equitable remedy for a breach of contract."   *Cho v. 401-403 57th St. Realty Corp.*, 752 N.Y.S.2d 55, 57 (App. Div. 2002). Moreover, it does not appear that CAI Rail is in fact asking for specific enforcement at all, as it does not seek to have Badger actually perform under the contract but rather seeks to enforce the remedial provisions of the Lease Documents, namely, the immediate return of the Cars.  *See Mercantile-Safe Deposit & Tr. Co. v. Trans World Airlines, Inc.*, 771 F. Supp. 90, 92-93 (S.D.N.Y. 1991) ("The Agreement demands that TWA pay money.  Thus, if plaintiff truly were seeking specific performance, it would be demanding that TWA pay money.  TWA has already refused to do so and now plaintiff seeks to enforce the specific contractual remedies listed in the Agreement."); *Connecticut Nat. Bank v. Trans World Airlines, Inc.*, 762 F. Supp. 76, 80 (S.D.N.Y. 1991) ("Technically, if CNB was demanding specific performance of TWA's obligations, it would be demanding that TWA pay the money it owes pursuant to the Agreement. . . .  Instead, CNB seeks to have the property returned, which is the precise remedy the parties previously agreed to. Thus, CNB is not really seeking specific performance of TWA's obligations, but rather, is seeking to enforce a contractual remedy agreed to by the parties in the event of a default.").

Regardless, it is not clear from the record where the Cars should be returned, particularly because CAI Rail has provided Badger with two locations during the course of this litigation.  *See* Dkt. 36 at 4; CAI Rail Second 56.1 Statement ¶ 17.  Moreover, CAI Rail has seemingly vacillated

on whether Badger should store the Cars, *see* Dkt. 32-3 at 2, and the exact outcome of those discussions is not clear from the record. CAI Rail elected to move for summary judgment prior to any significant discovery, and it is "[o]nly in the rarest of cases [that] summary judgment [may] be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). While this is one of those rare cases where the Court can grant summary judgment on the question of liability for breach of contract for the reasons stated above, significant questions remain regarding the remedial provisions of the Lease Documents.

\* \* \*

Therefore, because CAI Rail has failed to show that its tort claims for trespass and conversion, as alleged in Counts II and IV, are not duplicative of its breach of contract claim, nor has it shown that specific performance, as alleged in Count III, should be granted, the Court denies CAI Rail's Second Motion for Partial Summary Judgement in its entirety. In addition, CAI Rail is directed to show cause, no later than March 3, 2021, why the Court should not dismiss its trespass and conversion claims as duplicative of its breach of contract claim, and why the Court should not dismiss its specific performance claim as not constituting a cause of action but rather an equitable remedy for the Court to consider.

### IV. Conclusion

For the reasons stated above, CAI Rail's First Motion for Partial Summary Judgment is granted and its Second Motion for Partial Summary Judgment is denied. By March 3, 2021, CAI Rail is ordered to show cause why its claims for conversion (Count II), specific performance

24

(Count III), and trespass (Count IV) should not be dismissed.  The Clerk of the Court is respectfully directed to terminate the motions pending at Docket Numbers 23 and 40.

      SO ORDERED.

Dated: February 22, 2021
     New York, New York

                              JOHN P. CRONAN
                       United States District Judge